JUDGE ABRAMS

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

14 CV 7743

RECEIVED
SEP 2 4 2014
U.S.D.C. S.D. N.Y.
CASHIERS

MICHAEL J. NOBLE,

          Petition,

v.

US FOODS, INC.,

          Plaintiff/Appellee.

Civil Action No.

Hon.

**PETITION/MOTION TO PARTIALLY VACATE, MODIFY OR CORRECT ARBITRATION AWARD**

(Oral Argument Requested)

Pursuant to Sections 10 and 11 of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§10 and 11, Petitioner Michael J. Noble ("Noble"), by and through his counsel undersigned, petitions/moves the Court for an order partially vacating, modifying or correcting an arbitration award entered in an arbitration proceeding on June 30, 2014 ("Award"), which became final on July 6, 2014. (A true and correct copy of the Award is attached to the Declaration and Certification of David N. Farren ("Farren Cert.") filed with this Petition/Motion, with relevant excerpts of the record below ("Record") attached thereto, which is hereby incorporated in this Petition/Motion by reference, at <u>Tab A</u>).  Noble alleges:

## NATURE OF THE ARBITRATION AND THIS PETITION

1. The subject arbitration arose out of a written contract, a Management Shareholders Agreement ("MSA"), that governs Noble's shareholder rights in stock he had purchased for $500,000.00 when he was employed by USF as its

1

Vice-President of Shared Services in 2007 and, in addition, some $350,000.00 in accumulated vested stock options and other rights he had acquired since then.   It is uncontested that the stock is currently worth more than $1.2 million since the announcement of USF's acquisition by Sysco Corporation.

2.  USF terminated Noble on December 11, 2012, claiming that he had breached the MSA and his fiduciary duties.

3.  Noble contested his termination as wrongful and, on February 5, 2013, he and USF entered into a signed Settlement Agreement resolving all issues.

4.  On May 15, 2013, however, USF repudiated the Settlement Agreement and made a demand for arbitration of claims it alleged against Noble and Phillip Roszac ("Roszak"), a fellow USF executive who had also been terminated, with AAA offices in New York City, New York.  (Arbitration Demand, Record Tab G).

5.  USF claimed in the arbitration that Noble had been terminated for cause in breach of the MSA in that he had misappropriated and disclosed its "confidential information." Noble filed a Counterclaim asking that his settlement agreement be enforced and/or for damages arising out of his wrongful termination, defamation and other wrongs committed by USF.  (Counterclaim, Record Tab H).

6.  On July 8, 2013, just after the arbitration was initiated and long before it had concluded and any determination was made with regard to USF's damages claims, USF unilaterally took – i.e., *stole* – Noble's stock he had purchased when

2

he was employed by USF in 2007, claiming it had a right to "offset" the entire $850,000.00 value of the stock at the time, including that $500,000.00 he had paid for it out of his own pocket, against its purported, but unspecified and unproven, "damages" allegedly caused by Noble's alleged breach of the MSA.

7. USF's theft of Noble's stock and vested stock rights, whether by offset or otherwise, was not permitted by the MSA or any other contract or document that Noble had signed when he purchased his stock in 2007. Noble added claims for conversion and securities fraud to his Counterclaim in the arbitration.

8. After an eight-day arbitration hearing, the Arbitrator entered the Award on June 30, 2014, finding that Noble was terminated for cause, refusing to enforce the parties' Settlement Agreement, and denying Noble's Counterclaim, thereby condoning and authorizing USF's conversion of his stock and vested stock rights. (See Award, Record Tab A).

9. USF did not quantify or attempt to segregate or prove the amount of its purported damages caused by Noble's breach of the MSA or even the reasonable attorney fees or costs it had supposedly incurred because of any such breach on and as of the date it took his stock, and in fact openly *admitted* in the arbitration that it had *no actual damages* to show for any such breach. Moreover, the Arbitrator did not find that it had incurred or proven any such damages or award USF any such damages.

3

10.   Noble does not ask this Court to vacate, modify or correct the entire Award.  He asks only that the Court *partially* vacate, modify or correct that portion of the Award that denies Nobel's Counterclaim and condones and authorizes USF's wrongful conversion and securities fraud when it literally *stole* his stock.

11.   Upon information and belief, Roszac, Noble's former fellow employee who is separately represented by counsel, has filed or is filing with this Court a separate motion or petition to vacate, modify or correct other aspects of the Award.  To preserve his rights, Noble hereby joins in, and incorporates by this reference, Roszack's separate motion or petition and requests that the Court vacate the Award as to him to the same extent it vacates the Award as to Roszak upon any ground not addressed by this Petition/Motion.

## THE PARTIES

12.   Michael J. Noble is an individual who is a citizen of, and who was formerly was employed by US Foods in, Arizona.

13.   USF is a Delaware corporation organized and existing under the laws of the State of Delaware with its principle place of business in Rosemont, Illinois.

## JURISDICTION AND VENUE

14.   This Court has subject matter jurisdiction of this case: (a) pursuant to 9 U.S.C. §§ 10(a) and 11, which grant such jurisdiction the United States District Court in and for the district wherein the Award was made, and/or (b) pursuant to

28 U.S.C §1331 based on the complete diversity of citizenship of all parties and the amount in controversy that exceeds $75,000.00.

15. Venue is proper in this district: (a) pursuant to 9 U.S.C. §10(a) based on where US Foods initiated the arbitration, where the arbitration occurred and where the Award was made, and/or (b) pursuant to MSA ¶17(b) identifying New York, New York, as the venue of the arbitration.

<u>MATERIAL FACTS</u>

16. Noble's Proposed Findings of Fact and Conclusions of Law is attached to the Farren Cert. at Record <u>Tab E</u> ("Noble FF/CL") and is hereby incorporated in this Petition/Motion by reference in support of the following material facts.

17. Noble was employed by USF as its Vice-President of Shared Services in 2007. (Noble FF/ CL, Record Tab E, pp. 29-30, ¶35).

18. When he was employed by USF, Noble signed two (2) agreements that are at issue in this Petition/Motion to Vacate: (a) the MSA, dated November 16, 2007, and (b) a separate Non-Solicitation and Non-Disclosure Agreement of the same date (the "<u>NSND</u>"). (Noble FF/CL, Record Tab E, pp. 29-30, ¶35; Copies of the MSA and the NSND are provided to the Court as Record <u>Tab B</u> (MSA) and <u>Tab C</u> (NSND), respectively; see Arbitration Hearing Transcript, "<u>HT</u>," relevant excerpts of which are attached as Record <u>Tab F</u>, pp. Noble Test. Day 3, pp. 320-21; Pryor Test. Day 4, pp. 181-82).

19. Noble purchased $500,000.00 in USF stock when he was employed by USF in 2007 pursuant to the MSA, which stock was held in a third-party account with Fidelity Investments Stock Plan.  (Noble FF/CL, Record Tab E, pp. 29-30, ¶35; see HT, Record Tab F, pp. Noble Test. Day 3, pp. 320-21).

20. Nobel was terminated by USF on December 11, 2012, for allegedly breaching the MSA and violating his fiduciary duties.  (Noble FF/CL, Record Tab E, pp. 41-42, ¶¶ 62-63).

21. Noble was terminated when USF discovered he had sent anonymous letters to the company's General Counsel and Chief Compliance Officer, Juliette Pryor, reporting what both he and Pryor perceived to be an illegal conflict of interest that involved an affair between John Lederer, USF's CEO, and a third-party USF vendor that Noble believed had been receiving special treatment and non-competitive contract prices and revenues.  (Noble FF/CL, Record Tab E, pp. 41-45, ¶¶ 62-64).

22. Noble claims that he was wrongfully terminated for reporting the affair and conflict of interest as a "whistle blower" protected by state and federal laws.  (Noble FF/CL, Record Tab E, pp. 45-81, ¶¶ 65-127).  Noble also claims that, by terminating him for alleged breaches of the MSA and making false statements about him to others, USF defamed him and robbed him of his ability to obtain other employment.  (Noble FF/CL, Record Tab E, pp. 81-96, ¶¶ 128-161).

23. On February 5, 2013, Noble and USF entered into a fully-executed Settlement Agreement resolving all such issues. (Noble FF/CL, Record Tab E, pp. 6-21, ¶¶ 8-19).

24. On May 15, 2013, USF repudiated the Settlement Agreement, sued Noble in Illinois District Court, and made a demand for arbitration of the claims it has made against Noble and Roszac in this case.   (Noble FF/CL, Record Tab E, pp. 21-22, ¶¶ 20-22).

25. USF claimed in the arbitration that Noble had breached the MSA and his fiduciary duties by disclosing supposedly "confidential" information to third-parties. (USF Arbitration Demand, Record Tab G; see Noble FF/CL, Record Tab E, pp. 80-96, ¶¶ 163-80).

26. Noble filed a Counterclaim in the arbitration below to allege that USF had unilaterally repudiated and breached the parties' Settlement Agreement and that the terms of the agreement, including the parties' waiver of all claims, should be enforced. (Noble Counterclaim, Record Tab H; see Noble FF/CL, Record Tab E, pp. 18-29, ¶¶ 18-34). Noble also alleged that USF had wrongfully terminated him as a "whistle blower" and had defamed him and robbed him of his good name and reputation. (Id., pp. 81-96, ¶¶ 128-161).

27. On July 8, 2013, after it had initiated the arbitration but long before the arbitration had concluded and any decision had been made regarding its damages

7

claims, USF sent Noble a letter claiming to exercise its right to repurchase his stock in the company and informing him that it had "offset" the $850,000.00 value of his stock, including the $500,000.00 he had paid for it, against damages it had allegedly incurred because of his breach of the MSA. (Noble FF/CL, Record Tab E, p. 3, ¶5, pp. 29-30, ¶35; USF's letter ( "USF Repurchase Notice") is attached as Record Tab D; see also HT, Record Tab F, Pryor Test. Day 4, pp. 181-82).

28. Nobel added claims for conversion of his stock and securities fraud to his Counterclaim in the arbitration. (Noble FF/CL, Record Tab E, pp. 29-37, ¶¶ 35-48; see Noble FF/CL, pp. 29-37, ¶¶ 35-48).

29. USF openly *admitted* in the arbitration that it had *no actual damages* to show for Noble's alleged breach of his fiduciary duties or the MSA. (Noble FF/CL, Record Tab E, pp. 6-7, ¶7 & pp. 102-03, ¶169; HT, Record Tab F, Locasio Test. Day 6, p. 106 – admitting that he cannot "put a specific dollar amount" on any loss due to USF's allegedly confidential documents being "in the open," and testimony affirming the lack of any actual damages – and pp. 217 & 223 – further admitting that USF confidential information held by Noble or Roszak that is never disclosed would not cause "actual financial losses" to USF; Pryor Test. Day 2, pp. 242-48 –admitting that USF's damages are essentially its attorney fees and investigation costs, and Day 6, pp. 10-14 – same); Swanson Test. Day 5, p. 124 – no knowledge of Noble ever publicly sharing any USF confidential information).

8

30. Moreover, USF did not attempt to specify, segregate or quantify its damages incurred because of any such breach, and the Arbitrator did not find or award USF any such damages.  (See Award, Record Tab A).

31. The Arbitrator granted USF's claims against Noble for breach of the MSA and his fiduciary duties and denied all of Noble's Counterclaim, including his claims for conversion of his stock and securities fraud, and thereby allowed UFS's purported "offset" of its unspecified and unproven damages against all of his stock. (See Award, Tab A, first document).

32. The Award with regard to Noble's stock interests and USF's ability to repurchase and "offset" its unspecified and unproven damages against his stock, demonstrates that the Arbitrator abused his arbitral authority and ruled in favor of USF and against Noble with regard to all such issues for reasons that are clearly outside and beyond the express terms and the essence of the MSA, the contract granting him arbitral authority, contrary to the clear and unambiguous terms of the MSA and in complete and manifest disregard of the law.

<u>USF's Purported Repurchase and Offset of Noble's Stock</u>

33. USF, in its July 8, 2013, letter sent to Noble informing him of its re-purchase of and "offset" against his stock, cited three sources of its purported right to do that: (a) the MSA, (b) the NSND, and (c) a common law right of offset. (See USF Repurchase Notice, Record Tab D).

## The MSA

34. The MSA, the agreement Noble signed when he was employed by USF and pursuant to which he had purchased his USF stock in 2007, is the source of, the Arbitrator's arbitral authority in this case.   (MSA, Record Tab B, p. 18, ¶17).

35. Pursuant to MSA ¶17(a), Delaware law applies to all issues of contract construction at issue in this case.   (MSA, Record Tab B, p. 18, ¶17(a)).

36.  The MSA provides US Foods with a right to repurchase Noble's stock *only if* it elects to do so within *180 days* from the date he was terminated.

37.  Specifically, ¶5(a) of the MSA states that, if Noble's employment is terminated for cause (defined as a ""Section 5(a) Call Event"), which is what the Arbitrator found, USF has a right to elect to repurchase his stock and, in the event that it does: "(I) the Company may purchase at a per share purchase price equal to [in this case, the Base Price – i.e., the $500,000.00 Noble paid for his stock]." (MSA, Record Tab B, p. 7, ¶5(a)).[1]

38.  Paragraph 5(d) of the MSA states that, in order to make that election, US Foods has *180 days*:

> *from the date of any Call Event* (or, if later, with respect to a Section 5(a) Call Event, the date after discovery of, and the applicable cure period for, an impermissible transfer constituting a Section 5 Call Event) in which to give *notice in writing to*

---

[1] Without waiving the issue, Noble assumes and accepts for the purpose of argument only the Arbitrator's findings with regard to his termination for cause.

> *[Noble] of its election of its rights and obligations pursuant to this Section 5* ("Repurchase Notice")

(MSA, Record Tab B, pp. 8-9, ¶5(d)) (emphasis added).[2]

39. July 8, 2013, the date of the USF Repurchase Notice sent to Noble purporting to repurchase his stock, is *more than 180 days* from his December 11, 2012, termination ("Call Event") date, and is in fact some *209 days* from that date.

40. By the clear, express and unambiguous terms of the MSA, USF failed to repurchase Noble's stock within the time permitted by ¶5(d) of the MSA.

41. By the clear, express and unambiguous terms of the MSA, USF had not repurchased Noble's stock when it purported to do so and, as a consequence, did not own the stock and had nothing against which it could have offset anything it believed Noble owed the company when it purported to do so on July 8, 2013.

42. In a letter USF sent to Roszak on January 17, 2013, shortly after he was terminated, USF *expressly acknowledged* that its stock repurchase rights were subject to the foregoing 180-day Repurchase Notice requirement. (See Award, Record Tab A, pp. 53-54, ¶¶ 162-63).

43. Noble did not receive such a letter at the time he was terminated and did not receive notice of any kind that USF had elected to repurchase his stock until

---

[2] Note that the parenthetical "if later" Section 5(a) Call Event exception to the 180-day rule does not apply here because a prohibited transfer of stock by a Management Stockholder Entity (employee) described by §5(a)(ii) is a different Call Event than the termination of employment for cause described by §5(a)(i).

July 8, 2013, the date of its Repurchase Notice. (See Noble FF/CL, Record Tab E, pp. 29-30, ¶35).

44.   Accordingly, by the clear, express and unambiguous terms of the MSA, as USF itself had acknowledged, because USF failed to repurchase Noble's stock within the time permitted by the MSA, it did not own the stock and had nothing against which it could have offset anything, and Noble to this day retains equitable title to and ownership of the stock, which was worth approximately $850,000.00 on July 8, 2013, when USF took it, and is now worth approximately $1.2 million.

45.   The MSA "offset" provision that US Foods specifically relied on in the arbitration, ¶20, does not give it any such offset right. (See FF/CL, Record Tab E, ¶36(b)). Paragraph 20, the "Withholding" provision, states:

> 20. <u>Withholding</u>. The Company or its subsidiaries shall have the right to deduct from any cash payment made under this Agreement to the applicable Management Stockholder Entities [employee] any federal, state or local income or other taxes required by law to be withheld with respect to such payment, if applicable.

(MSA, Record Tab B, p. 18, ¶20). This provision on its face has nothing to do with a right to offset and is limited to tax withholdings from payments made to Noble.

46.   Furthermore, and at a bare minimum, ¶22 of the MSA, the "Covenant Not to Disclose Confidential Information and Other Restrictive Covenants," does provide USF with a kind of offset remedy, but **only** "[i]n the event that [Noble] breaches any of the provisions of [that covenant] . . . ," and, in that event, expressly

12

*limits* what USF may recoup from him as the result of any such breach. (MSA, Record Tab B, p. 20, ¶22(c)). It states that, in that event of any such breach:

> The [employee] shall be required to pay to the Company *any amounts actually paid to him or her by the Company in respect to any repurchase by the Company* of any Options or Stock held by such [employee], ***provided that (x) with respect to Purchased Stock [i.e., stock the employee had purchased from [USF], the [employee] shall be required to pay to the Company only such amounts, if any, that the [employee] received in excess of the Base Price paid by the [employee] in acquiring the Purchased Stock, on a net after-tax basis*.**

(MSA, Record Tab B, p. 20, ¶22(c)) (emphasis added).

47. Accordingly, by the clear, express and unambiguous terms of the MSA, *even if* USF had repurchased Noble's stock when it purported to do so, and *even if* USF had actually paid Noble for his stock and had a right to reclaim the proceeds from him, ***USF did not have a right to recoup any amount "in excess of the Base Price paid by [him] in acquiring the Purchased Stock, on a net after-tax basis.*"**

48. In accordance with its express and unambiguous terms, then, MSA ¶22(c) is the ***minimum baseline amount*** – the $500,000.00 that Noble paid for his stock when employed by USF in 2007 – that USF could possibly be entitled to recoup from Noble or to "offset" against his stock.

49. Moreover, and again, USF ***admitted*** in the arbitration that it had ***no actual damages*** to show for Noble's alleged breach of the MSA, and the Arbitrator did not find or award such damages. (Noble FF/CL, Record Tab E, pp.

6-7, ¶7 & pp. 102-03, ¶169; HT, Record Tab F, Locasio Test. Day 6, pp. 106 &

217 & 223; Pryor Test. Day 2, pp. 242-48; Award, Record Tab A).

<u>The NSND</u>

50.  The NSND, a Confidentiality/Non-disclosure Agreement, is a separate

agreement Noble signed when he was hired by USF in 2007.  (See NSND, Record

Tab C, p. 18, ¶17).

51.  The NSND is incorporated by reference into the MSA. (See MSA,

Record Tab B, ¶22(a)).  It is the MSA, however, not the NSND, that expressly and

specifically applies to issues pertaining to Noble's stock rights.

52.  In any event, nothing in the NSND itself provides USF with a right to

offset anything against Noble's stock.  NSND ¶12, the "Withholding of Monies

Due" provision that USF relied on in the arbitration, provides:

> 12. <u>Withholding of Monies Due</u>.  To the extent permitted by law,
> Employee authorizes the Company to ***deduct from any wage or
> other amounts due Employee,*** including remuneration,
> compensation, bonus, commission, and/or fringe benefit ***pro-
> vided in return for services provided by Employee,*** including
> from the final paycheck or any other payment due Employee
> upon termination, ***all monetary obligations of any type*** (including
> but not limited to the value of Company Property and any debts
> or obligations to the Company) that are owed by Employee to the
> Company.

(Record Tab C, p. 4, ¶12) (emphasis added).

53.  By the clear, express and unambiguous terms of NSND ¶12, it is a

paycheck "withholding," not an "offset," provision.

14

54. By the clear, express and unambiguous terms of NSND ¶12, it is expressly qualified and limited by its terms to permit withholding *only* "[t]o the extent permitted by law" – i.e., to permit withholding of amounts that can *lawfully* be withheld. It confers no right to USF to offset anything against Noble's stock.

55. By the clear, express and unambiguous terms of NSND ¶12, it is also expressly limited by its terms to grant a right to USF to "deduct" from Noble's wages or other "amounts due [to him] . . . provided in return for services provided by [him]" any such obligation. It confers no right to USF to offset anything against Noble's stock.

56. The NSND elsewhere also provides that, as a remedy for its breach, "Employee shall *reimburse* the Company for all *reasonable attorneys' fees and costs* incurred by the Company in enforcing this Agreement." (Record Tab C, p. 5, ¶15) (emphasis added).

57. By the clear, express and unambiguous terms of NSND ¶15, however, it is a "reimbursement," not an "offset," provision.

58. By the clear, express and unambiguous terms of NSND ¶15, it confers no right to USF to offset anything against Noble's stock and does not, and cannot as a matter of law, replace, modify or supersede the specific stock purchase and repurchase rights expressly set forth in the MSA.

59. Moreover, and again, USF *admitted* in the arbitration that it had *no actual damages* to show for Noble's alleged breach of the MSA and, specifically, USF did not specify or quantify its "reasonable" attorney fees and costs, and the Arbitrator did not find or award damages.   (Noble FF/CL, Record Tab E, pp. 6-7, ¶7 & pp. 102-03, ¶169; HT, Record Tab F, Locasio Test. Day 6, pp. 106 &  217 & 223; Pryor Test. Day 2, pp. 242-48; Swanson Test. Day 5, p. 124).

<u>Common Law Right of Offset</u>

60. US Foods did not have a separate common law right to offset anything it claims Noble owed when it took his stock as to any unliquidated damages.

61. USF did not obtain a ruling in the arbitration as to what its damages were when it took Noble's stock on July 8, 2013.

62. Anything USF could possibly claim that Noble owed when it took his stock could not conceivably have been anywhere near the $850,000.00 value of his stock at that time, or even the $500,000.00 price he paid for the stock.

63. Moreover, and again, USF *admitted* in the arbitration that it had *no actual damages* to show for Noble's alleged breach of the MSA and, specifically, USF did not specify or quantify its "reasonable" attorney fees and costs s, and the Arbitrator did not find or award damages.   (Noble FF/CL, Record Tab E, pp. 6-7, ¶7 & pp. 102-03, ¶169; HT, Record Tab F, Locasio Test. Day 6, pp. 106 &  217 & 223; Pryor Test. Day 2, pp. 242-48; Swanson Test. Day 5, p. 124).

<u>Noble's Conversion and Securities Fraud Claims</u>

64. The Arbitrator denied Noble's Counterclaim against USF, including his claims for conversion and securities fraud for stealing his stock.

65. Noble had, and has, valid claims for conversion because USF had no right to "offset" or otherwise take his stock interests based on the MSA or, to the extent it is applicable, the NSND or the law.   (See Noble FF/CL, Record Tab E, pp. 32-33, ¶41 & pp. 36-37, ¶48).

66. Noble had, and has, valid claims for securities fraud as well because USF had no right to "offset" or otherwise take his stock based on the clear and unambiguous terms of the MSA or, to the extent it is applicable, the NSND or the law. (See Noble FF/CL, Record Tab E, pp. 33-37, ¶¶ 42-48).

67. Taking Noble's stock violated §10b-5 of the Securities Exchange Act of 1934, §10, 15 U.S.C. §78j and/or 815 ILCS 5/12 and 815 ILCS 505 (Illinois securities laws) because Noble's stock interests are securities, USF committed a misstatement or omission of a material fact in connection with its purported, but unauthorized repurchase of those securities, with scienter, and Noble has sustained causal damages. (See Noble FF/CL, Record Tab E, pp. 33-34, ¶42).

68. As the result of USF's conversion and/or securities fraud, Noble has sustained damages of no less than $1.2 million (the undisputed current value of the stock) or, in that alternative, $850,000.00 (the undisputed value of the stock when

USF took it on July 8, 2013) or, at a minimum, $500,000.00 (the price Noble paid for the stock when he was employed by USF in 2007. (See Noble FF/CL, Record Tab E, pp. 34- 37 ¶¶ 43-48).

<u>The Arbitrator's Award</u>

69.  Despite the complete absence of any basis in the MSA to offset or to prove specifically or quantify the damages it allegedly had incurred because of Noble's breach of the MSA, the Arbitrator found that US Foods had a right to offset such damages against the stock he had purchased when he was employed by USF in 2007 based on the MSA and the NSND.

70.  The Arbitrator erroneously found that Noble had purchased his stock "[p]ursuant to the MSA and NSND." (Award, Record Tab A, p. 51, ¶154). The NSDA says nothing about Noble's stock purchase, other than referring to it as consideration in an introductory paragraph. (NSND, Record Tab C, p. 1, ¶1(a)).

71.  The Arbitrator then erroneously found that MSA ¶5(a), the "for cause" termination provision, does *not* contain a 180-day notice period within which US Foods could have repurchased Noble's stock. (Award, Record Tab A, p. 51, ¶155, stating: "Absent from 5(a) is a notice period requirement"; pp. 53-53, ¶163, to the same effect; pp. 67-68, ¶197 restating that conclusion).

72.  MSA ¶5(a), however, expressly defines a termination for cause as a "Section 5(a) Call Event," and MSA ¶5(d) contains the requirement that US Foods

18

has 180 days "from the date of any [such] Call Event" in which to give a repurchase notice. (See MSA, Record Tab B, pp. 8-9, ¶5(d)). The Award ignores and disregards this clear and unambiguous contract term.

73.  Moreover, as the Arbitrator himself noted, US Foods had expressly acknowledged in its earlier notice to Roszak that its stock repurchase rights were subject to the foregoing 180-day Repurchase Notice requirement.  (See Award, Tab A, pp. 53-54, ¶¶ 162-63).

74.  The Arbitrator further erroneously found that MSA ¶22(a) "empowers USF to claw back proceeds from employees' stock sales for violations of their employment agreements, including breach of confidentiality."  (Award, Record Tab A, p. 51, ¶155).  MSA ¶22(a), however, does nothing more than incorporate the NSND into the MSA, and the NSND contains no such right.  (See MSA, Record Tab B, p. 20, ¶22(a); NSND, Record Tab C, p. 4, ¶12, p. 5, ¶15).

75.  Moreover, any such "claw back" right in the MSA would be subject to the limitation imposed by MSA ¶22(c), stating that, "[i]n the event that [Noble] breaches any of the provisions of [the nondisclosure covenant]," Noble "shall be required to pay to [USF] any amounts actually paid to him . . . by [USF] in respect to any repurchase by [USF] of any Options or Stock held by [Noble], ***provided that*** (x) with respect to [Noble's] Purchased Stock, [Noble] ***shall be required to pay to [USF] only such amounts, if any, that [he] received in excess***

19

*of the Base Price paid by [him] in acquiring the Purchased Stock, on a net after-tax basis.*"  (MSA, Record Tab B, p. 20, ¶22(c)).  The $500,000.00 Noble paid for his stock is the *minimum baseline amount* that USF could possibly be entitled to recoup from Noble.

76.  The Arbitrator further erroneously found that NSND ¶12, the specific paycheck "withholding" provision discussed above, is "expansive" and includes a right to offset "the proceeds from USF's repurchase of [Noble's] stock."  (Award, Record Tab A, p. 51, ¶156; see NSND, Record Tab C, p. 4, ¶12).

77.  As noted, however, NSND ¶12, it is a "withholding" provision, not an "offset" provision.

78.  As also noted, NSND ¶12 is expressly qualified and limited by its terms to permit withholding only "[t]o the extent permitted by law" – i.e., to permit withholding only of employee obligations that can *lawfully* be withheld.  It confers no right to USF to offset anything against Noble's stock.

79.  As also noted, NSND ¶12 is also expressly limited by its terms to grant a right to USF to "deduct" from Noble's wages or other "amounts due [to him] . . . provided in return for services provided by [him]" any such obligation.  Again, it confers no right to USF to offset anything against Noble's stock.

80.  The Arbitrator further erroneously found, in an apparent attempt to repair or bolster his erroneous finding that USF was not bound by the 180-day

notice period within which it could repurchase Noble's stock, that NSND ¶12 did not require USF to "speculate" about what its unliquidated damages are when an employee leaves.  (Award, Record Tab A, p. 52, ¶157, p. 54, ¶164; and pp. 67-68, ¶197 restating that finding).  This, he said, is a "[r]eflexive invocation of section 12, without a good faith estimate of what is 'owed,' would be a contract violation."  (Id., p. 52, ¶158).  He then concluded, however, "[t]hat did not occur here," apparently finding, without any evidence or even an offer of proof or arguments made by USF, that USF had somehow, somewhere made such a good faith estimate.  (Id.).

81.   There was no good faith estimate or any evidence of such an estimate made by USF when it took Noble's stock, and USF did not even try to specify, quantify or segregate what its damages or its costs or "reasonable" attorney fees were when it took Noble's stock.

82.   USF did not obtain a ruling in the arbitration as to what its damages were until nearly a year after it took Noble's stock.

83.   Moreover, as noted, USF openly ***admitted*** in the arbitration that it had ***no such damages*** (Noble FF/CL, Record Tab E, pp. 6-7, ¶7 & pp. 102-03, ¶169; HT, Record Tab F, Locasio Test. Day 6, pp. 106 & 217 & 223; Pryor Test. Day 2, pp. 242-48; Swanson Test. Day 5, p. 124) and the Arbitrator did not expressly award any such damages to USF in his Award (Award, Record Tab A).

21

84. As also noted, there is no conceivable way that USF's unproven damages could have been as much as the $850,000.00 value of Nobel's stock, or even the $500,000.00 Noble had paid for it, when it stole his stock

85. The Arbitrator's Award with regard to these issues demonstrates that he abused his arbitral authority and ruled in favor of USF and against Noble with regard to all such issues for reasons that are clearly outside and beyond the express terms and the essence of the MSA, the contract granting him arbitral authority, and are contrary to the clear, express and unambiguous terms of the MSA, and, as such, are in complete, irrational and manifest disregard of the law and the MSA.

## COUNT ONE

86. Noble restates and incorporates the foregoing allegations in ¶¶ 1-84 of this Petition/Motion as though fully set forth herein.

87. The Award is subject to vacatur as a manifest disregard of the law with regard to the clear, express and unambiguous terms of the MSA and, to the extent it is applicable, the NSND.

88. The Award with regard to Noble's stock interests and USF's ability to take his stock is completely irrational and has no colorable basis in law or the clear and unambiguous terms of the subject contract(s).

89. The law that the Arbitrator ignored in that regard is clear and explicitly applicable to the matter before him.

22

90.    The law that the Arbitrator ignored in that regard is in fact improperly applied, leading to an erroneous outcome.

91.    The Arbitrator in that regard knew of the law's existence and its applicability to the issues before him, but intentionally disregarded it.

92.    The Arbitrator in that regard manifestly disregarded clearly applicable and explicit principles of contract construction.

93.    The Arbitrator's findings and conclusions in that regard contradict the clear, express and unambiguous terms of the MSA and/or, to the extent it is applicable, the NSND, and so far depart from the clear, express and unambiguous terms of these contracts that they do not even arguably derive from them.

94.    The Arbitrator's findings and conclusions in that regard so completely ignore and go beyond the clear, express and unambiguous terms of the MSA and, to the extent it is applicable, the NSND that the Arbitrator must have, in effect, rewritten, amended or modified those terms.

95.    The Arbitrator's findings and conclusions in that regard so completely ignore and go beyond the clear, express and unambiguous terms of the MSA and, to the extent it is applicable, the NSND that the Arbitrator must have based his Award on matters extraneous to the contract terms, such as extraneous policies or perverse equities, thereby wielding his own brand of industrial justice.

23

96. Furthermore, the Award is subject to vacatur as a manifest disregard of both federal and state (Illinois) securities – §10b-5 of the Securities Exchange Act of 1934, §10, 15 U.S.C. §78j and/or 815 ILCS 5/12 and 815 ILCS 505 (Illinois securities laws) – that prohibit USF's theft of Noble's securities.

97. Noble, therefore, is entitled to an order partially vacating the Award as a manifest disregard of the law.

## COUNT TWO

98. Noble restates and incorporates the foregoing allegations in ¶¶ 1-96 of this Petition/Motion as though fully set forth herein.

99. The Award is also subject to vacatur pursuant to 9 U.S.C. §10(a)(4), the statutory basis for vacatur that applies when an arbitrator "exceeded [his] powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."

100. The Award with regard to Noble's stock interests and USF's ability to take his stock is completely irrational and has no colorable basis in law or the clear and unambiguous terms of the subject contract.

101. The Arbitrator's findings and conclusions in that regard are so clearly outside and beyond the express terms and the essence of the MSA and, to the extent it is applicable, the NSND, that the Arbitrator has clearly ignored the terms and essence of those agreements and dispensed his own brand of industrial justice.

24

102. The Arbitrator's findings and conclusions in that regard contradict the clear, express and unambiguous terms of the MSA and/or, to the extent it is applicable, the NSND, and so far depart from the clear, express and unambiguous terms of these contracts that they do not even arguably derive from them.

103. The Arbitrator's findings and conclusions in that regard so completely ignore and go beyond the clear, express and unambiguous terms of the MSA and, to the extent it is applicable, the NSND that the Arbitrator must have, in effect, rewritten, amended or modified those terms.

104. The Arbitrator's findings and conclusions in that regard so completely ignore and go beyond the clear, express and unambiguous terms of the MSA and, to the extent it is applicable, the NSND that the Arbitrator must have based his Award on matters extraneous to those contract terms, such as extraneous policies or perverse equities, thereby wielding his own brand of industrial justice.

105. Noble, therefore, is entitled to an order partially vacating the Award pursuant to 9 U.S.C. §10(a)(4).

## COUNT THREE

106. Noble restates and incorporates the foregoing allegations in ¶¶ 1-105 of this Petition/Motion as though fully set forth herein.

107. Noble joins in, and incorporates by reference, claims made by Roszak in his separate motion or petition to vacate, modify or correct other aspects of the

25

Award and requests that the Court vacate the Award as to him to the same extent it vacates the Award as to Roszak

Oral Argument Requested

Noble hereby requests oral argument of the matters and issues presented by this Petition/Motion and asks that the Court set a hearing date.

Relief Requested

WHEREFORE, Noble respectfully requests that this Court enter judgment in this matter granting him the following relief:

A.   Partially vacating the Arbitration Award insofar as it: (a) denies Noble's Counterclaim against USF for conversion and/or securities fraud, and/or (b) approves of and condones USF's taking his stock;

B.   Partially reversing the Arbitration Award in that regard and awarding damages to Noble for the unauthorized and unjustified loss of his stock in an amount of: (a) $1.2 million, its uncontested current value, or, in the alternative, (b) $850,000.00, the uncontested value of the stock on and as of July 8, 2013, when USF took it, or, at a minimum, (c) $500,000.00, the price Noble paid for the stock out of his own pocket when he purchased it in 2007.

C.   Vacating the Arbitration Award upon any claim made by Roszak in his separate motion or petition to vacate, modify or correct other aspects of the Award

26

upon any ground not addressed by this Petition/Motion to the same extent the

Court grants relief to Roszak;

    D.    Awarding him his taxable costs incurred herein; and

    E.    Awarding him such other relief as the Court deems just and proper.

DATED this _25_ day of September, 2014.

                Jaburg & Wilk, P.C.

Maria Crimi Speth (AZ Bar #012574)[3]
Kraig J. Marton (AZ Bar #003816)
David N. Farren (AZ Bar #007384)
Attorneys for Petitioner

---

[3] Also admitted to the New York State Bar and the United States District Court for the Southern District of New York (Bar Code #2225951).